FILED
2013 Mar-28 PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CARL E. MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:11-CV-4000-VEH** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER,** | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION[1]

Plaintiff Carl E. Miller ("Miller") seeks review of a final adverse decision of

the Commissioner of the Social Security Administration (hereinafter

"Commissioner" or "Secretary"), who denied his application for disability

insurance benefits ("DIB") under Title II of the Social Security Act (the "Act")

---

[1] The court recently became aware that Carolyn W. Colvin was named the Acting Commissioner of the Social Security Administration on February 14, 2013. *See* http://www.socialsecurity.gov/pressoffice/factsheets/colvin.htm ("On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.") (last accessed on Mar. 13, 2013). Under 42 U.S.C. § 405(g), "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office." Accordingly, pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the court has substituted Carolyn W. Colvin for Michael Astrue in the case caption above and **HEREBY DIRECTS** the clerk to do the same party substitution on CM/ECF.

and supplemental security income ("SSI") under Title XVI.  Miller timely pursued and exhausted his administrative remedies available before the Commissioner. This case is ripe for review pursuant to 42 U.S.C. § 405(g) of the Act.  The court has carefully considered the record and, for the reasons which follow, finds that the decision of the Commissioner is due to be **AFFIRMED**.

## FACTS AND PROCEDURAL HISTORY

Miller was born in 1960 and was a fifty (50) year old male at his hearing before the Administrative Law Judge ("ALJ") on September 1, 2010.  (R. at 57.) Miller has a ninth grade education.  (*Id.*)  Miller has worked in construction his entire life.  (R. at 59.)  He last worked as a painter in either 2005 or 2007. Miller complains of multiple ailments, but the ALJ found that only Miller's osteoarthritis and degenerative disc disease are severe impairments.  (R. at 27.)  Miller contends that these impairments cause him severe back pain.

Miller filed his disability application on April 20, 2009.  (R. at 25.)  The Commissioner initially denied his claim on August 25, 2009.  Miller then requested an administrative hearing, which was held on September 1, 2010.  (R. at 25.)  The ALJ denied Miller's application on December 7, 2010.  (R. at 39.) Miller sought review by the Appeals Council, but it declined to review his claim on August 16, 2011.  Thus, the ALJ's decision became the final decision of the

Commissioner on that date.  (R. at 14.)  Miller then brought this action.

## STANDARD OF REVIEW[2]

The court's review of the Commissioner's decision is narrowly circumscribed.  The function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted). This court will determine that the ALJ's opinion is supported by substantial evidence if it finds "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id*.  Substantial evidence is "more than a scintilla, but less than a preponderance."  *Id*.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo*, "because no presumption of validity attaches to the [ALJ's] determination of the proper legal standards to be applied."  *Davis v.*

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

*Shalala*, 985 F.2d 528, 531 (11th Cir. 1993).  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  *See Cornelius v. Sullivan*, 936 F. 2d 1143, 1145–46 (11th Cir. 1991).

## STATUTORY AND REGULATORY FRAMEWORK

To qualify for DIB and SSI as well as establish his entitlement for a period of disability, a claimant must be disabled as defined by the Act and the Regulations promulgated thereunder.[3]  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] 12 months."  20 C.F.R. § 416.905(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 416.908.

---

[3]  The "Regulations" promulgated under the Act are listed in 20 C.F.R. Parts 400 to 499, as current through March 14, 2013.

4

The Regulations provide a five-step process for determining whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4)(i–v).  The Commissioner must determine in sequence:

(1)   whether the claimant is currently employed;
(2)   whether the claimant has a severe impairment;
(3)   whether the claimant's impairment meets or equals an impairment listed by the Secretary;
(4)   whether the claimant can perform his past work; and
(5)   whether the claimant is capable of performing any work in the national economy.

*See Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2010); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied steps one and two, [he] will automatically be found disabled if [he] suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform [his] work, the burden shifts to the Secretary to show that the claimant can perform some other job."  *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993), *overruled in part on other grounds*, *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999); *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The Commissioner must further show that such work exists in the national economy in significant numbers.  *Foote*, 67 F.3d at 1559.

## FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

At Step One, the ALJ found that Miller had not engaged in substantially gainful employment since November 5, 2009, his amended alleged onset date. (R. at 27.)  At Step Two, the ALJ found that Miller had the following severe impairments: osteoarthritis and degenerative disc disease.  (*Id.*)  The ALJ also found that Miller's allegations of fibromyalgia, constant headaches, hearing loss, and tinnitus either are not supported by the medical evidence or are not severe. (R. at 28–29.)  Additionally, the ALJ found that Miller's alleged mental impairments of depressive disorder and affective mood disorder are not supported by the medical evidence.  (R. at 29–30.)[4]  At Step Three, the ALJ found that Miller's severe impairments did not meet or medically equal a listed impairment.

Before proceeding to Step Four, the ALJ determined Miller's residual functioning capacity ("RFC").  He found that Miller could perform light work with the following restrictions:

> he can occasionally lift and/or carry including upward pulling of 20 pounds occasionally and 10 pounds frequently; he needs the option to sit/stand at will and can sit for four hours out of eight hour workday; stand an or walk four hours out of eight hour work day; occasionally balance, stoop but not repetitively, kneel and crouch, climb ramps and stairs, and use ladders but not ropes or scaffolds; should not crawl or

---

[4]  Miller has not challenged the ALJ's findings regarding these physical and mental impairments.

work at unprotected heights; frequently upper extremity use including pushing/pulling of arm controls frequent gross handling but no limitations with fine manipulation; should perform no heavy vibratory type work; should be paid by the hour and not by piece work.

(R. at 32.)  After determining Miller's RFC, the ALJ proceeded to Step Four. Based on the testimony of a vocational expert ("VE"), the ALJ concluded that Miller  cannot perform his past relevant work.  (R. at 36.)  At Step Five, the ALJ determined that based on Miller's age, education, work experience, and RFC, jobs exists in sufficient numbers in the national economy such that Miller is not disabled.  Therefore, the ALJ denied Miller's claim.

## ANALYSIS

This court is limited in its review of the Commissioner's decision in that the Commissioner's findings of fact must be reviewed with deference.  *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citing *Graham v. Bowen*, 790 F.2d 1572, 1574–75 (11th Cir. 1986)).  In contrast to factual findings, however, the Commissioner's conclusions of law are subject to an "exacting examination" or *de novo* review.  *See Martin*, 894 F.2d at 1529 (citing *Graham*, 790 F.2d at 1574–75); *Martin*, 894 F.2d at 1529 ("The Secretary's failure to apply the correct legal standards or to provide the reviewing court with sufficient basis for a determination that proper legal principles have been followed mandates reversal.")

(citations omitted).  In particular, this court has a "responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding."  *See Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (emphasis added) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)).[5]

Miller makes two arguments on appeal.  First, he contends that the ALJ failed to set forth good cause for rejecting the opinion of Dr. Angelia Elliott. Second, Miller contends that the ALJ improperly applied the Eleventh Circuit's pain standard.  The court will address each argument in turn.

## A.    Good Cause for Discrediting the Opinion of Dr. Angelia Elliott

In January 2010, Dr. Elliott completed a medical source statement ("MSS") regarding Miller's ability to work.  (R. at 245–46.)  She opined that Miller could lift and carry ten to fifteen pounds occasionally, but never lift or carry more than fifteen pounds.  (R. at 245.)  She limited him to fifteen minutes of standing and walking at a time with no more than one hour of either activity during an eight hour workday.  (R. at 245.)  She limited him to thirty minutes of sitting at a time with no more than four hours in an eight hour workday.  (R. at 245.)  Additionally,

---

[5]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Dr. Elliot opined that Miller could not climb, balance, stoop, kneel, crouch, or crawl. (*Id.*) If the ALJ had fully credited Dr. Elliott's MSS, then Miller would be unable to perform light work, which involves lifting twenty pounds at one time. *See* 20 C.F.R. § 404.1567(b). However, the ALJ discredited Dr. Elliott's MSS in making his RFC assessment. (R. at 33–35.) Miller contends this was error.

Ordinarily, the ALJ must afford substantial weight to the opinion of a treating physician "unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F. 3d 1436, 1440 (11th Cir. 1997) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). "Good cause" exists when "the doctor's opinion [is] not bolstered by the evidence, or where the evidence support[s] a contrary finding." *Id.* (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir.1987) and *Sharfarz v. Bowen*, 825 F.2d 278, 280–81 (11th Cir.1987)). Additionally, good cause exists when a doctor's opinion is "conclusory or inconsistent with her own medical records." *Id.* (citing *Jones v. Dep't of Health & Human Servs.,* 941 F.2d 1529, 1532–33 (11th Cir.1991) and *Edwards v. Sullivan,* 937 F.2d 580, 583 (11th Cir.1991)); *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240–41 (11th Cir. 2004) "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id.*

9

Here, the ALJ articulated several reasons for discrediting Dr. Elliott's MSS, including inconsistencies between her MSS and other record evidence.  First, the ALJ found that Dr. Elliott's MSS is inconsistent with her own treatment notes.  For example, at his visit on March 29, 2010, Miller reported throwing a <u>fifty</u> pound bag of feed on his shoulder earlier that month.  (R. at 251.)  Miller said this act caused him to fall down and hurt his tail bone.  Three days later, he actually sought treatment in the emergency room.  (*Id.*)  This incident occurred only two months <u>after</u> Dr. Elliott opined in her MSS that Miller should never lift more than <u>fifteen</u> pounds.  And, this incident raises a rather obvious question: why was Miller, who allegedly had been suffering from disabling back pain for months, trying to pick up a fifty pound bag of feed?  Dr. Elliott did not ask this obvious question.  And, her notes reveal no investigation of, nor explanation for, Miller's lifting of fifty pounds.  Nor did she counsel Miller to avoid lifting more than fifteen pounds.  From these facts, a reasonable person could conclude that Dr. Elliott's MSS was not consistent with her actual opinion of Miller's abilities.  Furthermore, Dr. Elliott apparently never questioned the sincerity of Miller's subjective complaints of back pain.  This is remarkable, given that Dr. Elliot had

previously denied Miller medication because she suspected drug seeking behavior.[6]  (R. at 208.)

Additionally, at the time Dr. Elliott completed her MSS, she did not have the benefit of her treatment notes from February, March, and June 2010.  These notes show that, at all three visits, Miller appeared "well-nourished" and "[i]n no acute distress."  (R. at 249, 252, 255.)  Dr. Elliott's assessment of Miller's musculoskeletal system was exactly the same for all three visits.  She noted lumbosacral spine abnormalities and muscle spasms, but also found that this region exhibited no tenderness on palpation.  (R. at 249, 252, 256.)  She noted that Miller's straight-leg raising tests were negative for both legs.  (R. at 249, 252, 256.)  These findings are not as severe as Dr. Elliott's objective observations from November and December 2009.  In fact, at Miller's December 2009 visit, Dr. Elliott did not record observing the obvious muscle spasms or other symptoms present during Miller's November 2009 visit.  (R. at 242, 244.)  Furthermore, Dr.

---

[6]  Dr. Elliott's failure to question Miller's sincerity is all the more remarkable given his too frequent request for pain medication since February 2010.  On February 4, 2010, Dr. Elliott prescribed Miller a ninety day supply of Lortab.  (R. at 256.)  This supply should have lasted until May 5, 2010.  Yet, when Miller returned to Dr. Elliott's office on March 29, 2010, she wrote him another prescription for a one hundred and twenty day supply of Lortab.  (R. at 252.)  Thus, when Miller left Dr. Elliott's office on March 29, 2010, he had a prescription for a one hundred twenty day supply of Lortab in addition to the almost thirty days remaining on his prescription from February 4.  Nonetheless, on June 16, 2010 (a mere seventy-nine days later), Miller returned to Dr. Elliott and received another one hundred and twenty day supply of Lortab.

Elliott listed the reason for Miller's December 2009 visit as "[n]eeds some medication refills." (R. at 242.) And, Dr. Elliott noted in December 2009 that Miller had reported that "muscle relaxers help" his back. (R. at 244.)

From these treatment notes, it is reasonable to conclude that Miller's condition stabilized, if not improved, after November 2009. Yet, in February 2010, Miller complained that his back pain had actually gotten worse. (R. at 255.) Thus, the ALJ was justified in concluding that Dr. Elliott's diagnosis was based largely on Miller's subjective complaints about pain. As discussed in Section B, below, the ALJ had reason to doubt the sincerity of Miller's subjective complaints. And, because the ALJ had reason to doubt Miller's subjective complaints, he had reason to doubt an MSS based largely on Miller's subjective complaints.

Second, Dr. Elliott's MSS is inconsistent with other record evidence. For example, Miller testified that he could lift up to thirty pounds at a time. (R. at 69.) This testimony is inconsistent with Dr. Elliott's opinion that Miller could lift no more than fifteen pounds at a time. Additionally, Dr. Elliott's MSS is inconsistent with Dr. Jane Teschner's physical assessment from July 2009. (R. at 263–71.) Dr. Teschner noted that Miller appeared in "no apparent acute actual distress." (R. at 267.) She found his cervical, thoracic, and lumbosacral spine to be normal. Miller's straight leg raise tests were negative for both legs. He was able to "tiptoe-

12

heel-walk-toe touch-heel-to-toe-walk-squat." (R. at 268.)  Miller was able to get

on the exam table without assistance and his gait and station were normal.  (*Id.*)

Based on her exam, Dr. Teschner found no physical restrictions with Miller's

range of motion for all joints.  (R. at 270–71.)  And, Dr. Teschner did not opine

that Miller suffers from any significant physical limitations.  (R. at  269.)[7]

Miller complains that the ALJ should not have considered Dr. Teschner's

examination because it was conducted three and a half months before his amended

alleged onset date.  (Doc. 10 at 17.)  However, Dr. Teschner's report is objective

medical evidence of Miller's condition near his amended alleged onset date.  The

ALJ was entitled to consider this evidence in assessing the validity of Dr. Elliott's

assessment of Miller's alleged impairments, especially given the temporal

proximity of Dr. Teschner's examination to Miller's amended alleged onset date.

Third, Dr. Elliott's course of treatment is inconsistent with Miller's

allegations of disabling pain.  From Miller's first visit in November 2009 to his

last reported visit in June 2010, Dr. Elliott's course of treatment remained

essentially unchanged.  In November 2009, Dr. Elliott prescribed Lortab and

Flexeril.  (R. at 244.)  At each subsequent visit—December 2009, February 2010,

---

[7]  Dr. Teschner did conclude that Miller suffered from mental impairments.  (R. at 269.)
The ALJ discounted this portion of Dr. Teschner's opinion, (R. at 29), and Miller has not
appealed that portion of the ALJ's decision.

March 2010, and June 2010—Dr. Elliott prescribed the same drugs at the same strength.  (R. at 242, 244, 256, 252, 248.)  In November and December 2009, Dr. Elliott did give Miller samples of Celebrex, but she never prescribed this medication.  (R. at 242.)  And, while Dr. Elliott prescribed Restoril in February 2009, this drug was to treat Miller's insomnia, not his back pain.  (R. at 256.)  Interestingly, Dr. Elliott's treatment remained unchanged even though Miller complained of increasing back pain in February 2010 and continued severe back pain in June 2010.  (R. at 255, 248.)

Conversely, Dr. Elliott's notes actually suggests that Miller's medications alleviated his pain.  At his December 2009 visit, Miller said that "muscle relaxers help."  (R. at 242.)  Dr. Elliott's note does not explain how much "muscle relaxers help[ed]," but again, it is significant that Dr. Elliott never changed Miller's medications.  And, though Miller reported that his back pain continued to get worse, he never told Dr. Elliott that his pain medication was not working.  (R. at 242–61.)  In fact, Miller continued to seek refills of his medications, suggesting that he found them helpful.  (R. at 33.)

Moreover, Dr. Elliott initially thought Miller needed an MRI.  (R. at 244.)  However, except for Miller's initial visit, Dr. Elliott never followed up on this recommendation.  According to her notes, she never sent Miller for an MRI or

14

even suggested that he get one.  (R. at 242–61.)  Nor did she refer Miller to a pain

specialist or for pain management.

Miller contends that he was unable to pay for these alternative treatments.

Yet, Dr. Elliott notes do not reflect that she ever discussed these treatments with

Miller.  Nor do her notes say anything about Miller's inability to pay.  Thus,

Miller's inability to pay does not appear to have factored into Dr. Elliott's

treatment decisions.  Miller's conservative treatment history, which is inconsistent

with his subjective complaints of pain, is another reason supporting the ALJ's

decision to discredit the validity of Dr. Elliott's MSS.  (R. at 34–35.)

Fourth, Miller contends that, because he has a nine year treatment

relationship with Dr. Elliott (he first saw her in the year 2000), her MSS is entitled

to controlling weight.  While Miller is correct that he first saw Dr. Elliott in the

year 2000, Miller is wrong about the significance of this fact.  Under 20 C.F.R.

§ 404.1527(c)(2)(i), the ALJ was required to consider the length of Dr. Elliott's

treatment relationship for the particular impairment.  Here, that is Miller's back

pain.  Yet, when Dr. Elliott completed her MSS, she had only seen Miller twice

regarding his back pain—once in November 2009 and once in December 2009.

(R. at 242, 244.)  Before that, Dr. Elliott had seen Miller only seven times—once

in 2000, three times in 2004, once in 2005, once in 2007, and once in February

15

2009. (R. at 204–09.) Before November 2009, Miller had only complained of back pain twice, once in 2000 and once in 2005. And, during those visits, back pain was not Miller's primary complaint. In May 2007 and February 2009, Miller did not even mention back pain. Furthermore, Dr. Elliott's own notes suggests she did not have a strong relationship with Miller. (R. at 206) (note by Dr. Elliott from February 2009 stating that "[i]t's been a while since [Miller] has been here"). Because Dr. Elliott had a relatively short treatment relationship with Miller regarding his back pain, the ALJ was entitled to question the strength of her MSS.

For the foregoing reasons, the ALJ identified good cause, supported by substantial evidence in the record viewed as a whole, to discredit Dr. Elliott's MSS. Dr. Elliott's MSS is inconsistent with her treatment notes and other evidence of record. To the extent her MSS is based largely on Miller's subjective complaints, the ALJ found such complaints not credible. The ALJ also noted that Dr. Elliott's course of treatment is inconsistent with Miller's allegations of disabling pain. Finally, the ALJ found that Dr. Elliott's MSS was not entitled to any special weight based on her treating relationship. Because substantial evidence supports the ALJ's findings, his decision to discredit Dr. Elliott's MSS is due to be **AFFIRMED**.

**B.    Miller's Subjective Complaints of Disabling Pain**

Miller also contends that the ALJ misapplied the Eleventh Circuit's pain standard.  (Doc. 10 at 22.)  The Eleventh Circuit's pain standard requires "evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain."  *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986) (citing *Hand v. Heckler*, 761 F.2d 1545, 1548 (11th Cir. 1985)).  Relatedly, "[w]hile both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, <u>neither requires objective proof of the pain itself</u>."  *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991) (emphasis added).  If the ALJ discredits a claimant's subjective allegations of pain, he must articulate specific reasons for doing so.  *See, e.g.*, *Walker v. Bowen*, 826 F.2d 996, 1004 (11th Cir. 1987).

The ALJ identified multiple reasons for discrediting Miller's subjective complaints.  The court will summarize them here: (1) "[t]he objective medical evidence does not demonstrate abnormalities which would interfere with [Miller's] ability to perform [a limited range of light work];" (2)  Miller sought routine refills for his Flexeril and Lortab, "suggesting good benefit;" (3) Dr.

Elliott's contemporaneous treatment records do not document complaints of uncontrolled pain; (4) Miller often went several months between visits to Dr. Elliott without seeking care for his pain in the interim; (5) Miller testified that he can lift twenty-five to thirty pounds at one time, which is inconsistent with Dr. Elliott's MSS; (6) Miller's daily activities are consistent with the ability to do light work and inconsistent with a finding of disabling pain; (7) Miller's work record shows he did not work consistently, which undermines his credibility.  (R. at 33–34.)

Miller contends that the ALJ's stated reasons are not sufficient to support a negative credibility finding.  First, Miller contends that the ALJ erred in finding the objective medical evidence is inconsistent with disabling levels of pain.  Second, Miller contends that the ALJ failed to consider the fact that Miller had taken Lortab for over 10 months.  Third, Miller contends that the ALJ reads too much into his daily activities.  Fourth, Miller contends that the ALJ should have inquired into how Miller supported himself during the years he had no income.  Because the ALJ did not make this inquiry, Miller contends the ALJ was unable to properly evaluate his credibility based on his work history.  The court rejects each of Miller's arguments.

Regarding Miller's first contention, the ALJ clearly considered the objective medical evidence from Dr. Elliott.  Dr. Elliott consistently noted that Miller was "in no acute distress," had negative straight leg raise tests, and no tenderness of the lumbosacral spine to palpation.  (R. at 33, 249, 252, 255.)  The ALJ also noted that Dr. Elliott's treatment records documented only relatively minor problems. For example, Dr. Elliott's x-rays of Miller's lower spine from November 2009 showed "only 'some arthritic changes' and loss of disk height no herniated, protruding or bulging disks or nerve root or spinal cord compromise, abnormal alignment, fracture, subluxation, or any significant stenosis."  (R. at 33.)  Though Dr. Elliott noted "abnormalities" of the lumbosacral spine, she never explained what she meant.  And, though Dr. Elliott noted muscle spasms of the paraspinal muscles, she never altered Miller's treatment.  (R. at 249, 252, 255.)  Moreover, Miller himself reported in December 2009 that Flexeril helped his muscle spasms. (R. at 33, 242.)

Miller suggests that, because Dr. Elliott found objective evidence of spinal abnormalities and muscle spasms, the ALJ was required to credit his subjective complaints.  He cites 20 C.F.R. § 404.1529(c)(2), which states:

> we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on

19

your ability to work solely because the available objective medical evidence does not substantiate your statements.

However, this regulation plainly permits an ALJ to discredit a claimant's allegations of disabling pain when those allegations are inconsistent with the objective medical evidence <u>and other evidence supports that conclusion</u>.  Here, the ALJ noted numerous other reasons for discrediting Miller's testimony.  Thus, the ALJ was permitted to discredit Miller's subjective allegations as inconsistent with the objective medical evidence.  *See also* 20 C.F.R. § 404.1529(c)(4) (" . . . [W]e will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. <u>We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you.</u>") (emphasis added).

To the extent Miller contends that the ALJ was required to find that the objective medical evidence is consistent with his allegations of pain, the court disagrees.  An X-ray showed relatively minor abnormalities in Miller's lumbosacral spine.  Dr. Elliott's treatment notes do not show that Miller suffered

from disabling pain.  Instead, her notes suggests that Miller's condition had improved with medication.

The ALJ's interpretation is further supported by Dr. Teschner's exam from July 2009.  Dr. Teschner found that Miller had no "motor, sensory, or reflex deficits" and had normal range of motion of all joints.  The ALJ further pointed out that, in July 2009, Miller was not on any pain medication.  Although Miller amended his alleged onset date to November 2009 (about four months after Dr. Teschner's examination), Dr. Teschner's exam can still constitute objective medical evidence of Miller's physical abnormalities.  This is especially true because her exam was conducted only a few months before Miller's amended alleged onset date and because Miller has not identified any event between Dr. Teschner's exam and November 2009 which would have significantly changed his physical condition.   Thus, the ALJ was entitled to consider Dr. Teschner's findings in assessing Miller's subjective allegations of pain.  Because the ALJ's assessment of the objective medical evidence was reasonable, the court rejects Miller's first contention.

Regarding Miller's second contention, the ALJ was certainly aware of the fact that Miller had taken Lortab for over ten months.  This fact alone does not prove that Miller suffers from disabling pain.  Instead, the ALJ was only required

to consider this fact in assessing how Miller's pain affects his ability to work.  *See* 20 C.F.R.  § 404.1529(c)(4) ("When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms <u>so that we can determine how your symptoms limit your capacity for work.</u>") (emphasis added).  Here, the ALJ considered the fact that Miller was taking Lortab and found it weighed against his allegations of disabling pain.  Specifically, the ALJ said, "Dr. Elliott has treated the claimant conservatively with oral medications for which the claimant has sought routine refills, suggesting good benefit."  (R. at 33.)  Because the ALJ considered this fact, Miller's second contention fails.

Regarding Miller's third contention, the court concludes that Miller's daily activities reasonably support the ALJ's negative credibility finding.  Miller's daily activities include maintaining his home without assistance, taking care of his cat, driving, sweeping, shopping for his own needs, going to church every one to two months, and doing light yard work.  (Doc. 10 at 26–27.)[8]  It is significant that Miller lives alone in a one room building with no running water or bathroom

---

[8]  The ALJ found that the Miller could do these activities (R. at 34) and Miller does not contest his finding.  (Doc. 10 at 26–27.)

facilities.  (R. at 34, 74.)   At his hearing, Miller testified that he prepares his own meals, which are mostly sandwiches.  (R. at 58.)  Miller also testified that he can stand for one to two hours in a day.  (R. at 70.)

In assessing the affect of a claimant's pain on his ability to work, the ALJ is entitled to consider the claimant's daily activities.  20 C.F.R. § 404.1529(c)(3)(i).  The ALJ found that Miller's daily activities are consistent with the ability to perform light work.  (R. at 34.)  This conclusion is reasonable.  Miller cares for himself despite living alone in a building without running water or bathroom facilities.  Miller engages in light yard work, cares for his cat, drives, sweeps, and prepares his own meals.  These activities are reasonably inconsistent with Miller's allegations of disabling pain, when considered with other evidence in the record.

Furthermore, Miller testified that he could lift twenty-five to thirty pounds at a time.  This amount would enable him to perform light work.  *See* 20 C.F.R. § 1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").  Though Miller said he could not lift this much everyday, the record also shows that he tried to throw a fifty pound bag of feed on his shoulder.  (R. at 68.)  From this evidence, the ALJ could reasonably doubt the truthfulness of Miller's testimony.

The court is mindful that "participation in every day activities of short duration, such as housework or fishing, [do not] disqualif[y] a claimant from disability." *See Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Still, the ALJ is entitled to consider Miller's daily activities in assessing the veracity of his subjective complaints of pain. *See* 20 C.F.R. § 404.1529(c)(3)(i). In this case, Miller's daily activities, when considered with the record as a whole, reasonably support the ALJ's negative credibility finding.

Finally, regarding Miller's fourth contention, the court finds his work history reasonably supports the ALJ's negative credibility finding. In assessing a claimant's credibility, an ALJ must consider his work history. *See* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p at *5. Miller contends that poor work history can "support an inference that a claimant's testimony of disability is truthful." (Doc. 10 at 28) (citing *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998)). The court rejects Miller's contention for two reasons. First, *Schaal* is a Second Circuit case and, therefore, nonbinding. Second, even if *Schaal* were binding precedent, it would not apply here. The court in *Schaal* explained that "[a]n ALJ should explore a claimant's poor work history to determine whether [his] absence from the workplace cannot be explained adequately (making appropriate a negative inference), or whether [his] absence is consistent with [his] claim of disability."

24

Here, it is undisputed that Miller did not work in the years 2003, 2006, 2008, and 2009, and had only $4,000 of earnings for 2007.  (R. at 34.)  These years are well before Miller's amended alleged onset date of November 5, 2009.  Moreover, Miller's own statements to Dr. Elliott establish that his allegedly disabling pain did not appear until mid-2009.  (R. at 244.)  Therefore, the ALJ was justified in drawing a negative credibility inference from Miller's work history.

As explained above, Miller has not shown that the ALJ erred in applying the Eleventh Circuit's pain standard.  Therefore, the Commissioner's decision is due to be **AFFIRMED**.

## IV.   CONCLUSION

For the foregoing reasons, the decision of the Commissioner is due to be, and hereby is, **AFFIRMED**.  A separate final judgment will be entered.

**DONE** and **ORDERED** this the 28th day of March, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

25